CAIN *v.* CARLLEE.

Opinion delivered November 23, 1925.

1. TRIAL—SEPARATE FINDINGS OF LAW AND FACT.—Under Crawford & Moses' Dig., § 1309, requiring the court, in trials of questions of fact, to state in writing the conclusions of fact separately from the conclusions of law, it is not reversible error for the court to make a general finding of law and facts where no request is made for separate findings; and where the losing party in his motion for new trial assigns as error the failure of the court to make separate and special findings of fact and declarations of law, the court may, if it elects, treat the motion as one for special findings, and make the findings after the judgment has been entered.

2. APPEAL AND ERROR—FAILURE TO MAKE SEPARATE FINDINGS—WAIVER.—Where the losing party failed to object to special separate findings of law and fact, made after he had filed a motion for new trial on ground of the court's failure to make such separate findings, he cannot object to such special findings, either because they were made out of time or were not full enough.

3. ELECTIONS—DEDUCTION OF ILLEGAL VOTES.—In a primary election contest, where the parties agree to purge the ballot boxes of illegal votes which were deducted from the votes as determined by the central committee, the votes of the opposing parties as thus ascertained must be taken as *prima facie* the result of the election.

4. ELECTIONS—ILLEGAL VOTES—EFFECT.—In a primary election contest where illegal votes can be segregated from the rest of the votes without assailing the integrity of the entire box, only the illegal votes should be thrown out.

5. ELECTIONS—FRAUD IMPEACHING VOTE OF PRECINCT.—In a primary election contest, proof that a single vote was registered in the name of a party who did not vote at such election is not sufficient to impeach the integrity of the entire vote of the precinct.

6. ELECTIONS—EVIDENCE OF FRAUD.—In a primary election contest, proof that two votes in a precinct were changed from one candidate to the other, without showing when or by whom they were altered, will not be sufficient to impeach the integrity of the entire vote, but such votes will be counted for the candidate in whose favor they were cast.

7. ELECTIONS—OBJECT OF ELECTION LAWS.—The object of our Constitution (art. 3, § 11) and statutes concerning elections is to guarantee that the sovereign will of the electorate as expressed by their ballots shall not be thwarted.

8. ELECTIONS—PRESUMPTION OF REGULARITY.—Election officers are presumed to comply with the provisions of the Constitution and statutes governing elections, so that returns made by them showing the result of the election are *prima facie* correct, and are not to be overturned except by proof tending to show such fraud as to make it impossible to ascertain who received a majority of the votes cast.

9. ELECTIONS—FAILURE OF OFFICERS TO TAKE OATH.—Crawford & Moses' Dig., § 3768, providing that in primary election contests the county central committee shall examine the ballots, hear testimony, cast out illegal votes, and determine the true votes, indicates that it was not contemplated that a precinct vote should be thrown out because of the failure of the election officers to take the oath required by § 3755 or make certificate as required by § 3766; especially since art. 3, § 11, of the Constitution requires the trial court to ascertain who received a majority of the legal votes cast, whether returned by the election officers or not.

10. ELECTIONS—CORRUPT PRACTICE ACT.—Under Crawford & Moses' Dig., § 3772, giving a right of action to a candidate to contest the certification of nomination by the county central committee, and § 3775, providing that on a showing that a successful candidate has violated the election laws, the court may deprive the candidate of the nomination, *held* that there is no requirement that one contesting a nomination shall have been guiltless of violating the election laws.

11. ELECTIONS—CORRUPT PRACTICE ACT—OUSTER.—The object of § 3776, Crawford & Moses' Dig., providing that a defendant in contest proceedings, who shall have been elected to office as the party nominee, after it has been determined that he was not entitled to the nomination on account of a violation of the corrupt practice act, shall be ousted from office, was to prevent one illegally nominated from holding the office, but not to entitle the contestant to the office.

12. ELECTIONS—MOTION TO DISMISS CONTEST.—A trial by the court in an election contest on the merits is tantamount to overruling the motion of the successful candidate to dismiss petition of contestant.

13. ELECTIONS—WHEN COUNT NOT FINAL.—In an election contest, where the court stated that, with certain contested precincts disregarded, there was no reason for finding the number of votes each candidate received, since it was apparent that the majority was against the contestant, *held*, that, since the court erred in disregarding such precincts, there was no final count, and the result of the election was not declared by the court.

14. ELECTIONS—DETERMINATION ON APPEAL.—The Supreme Court will not try the facts on appeal unless they are undisputed,

in which case it becomes a question of law as to what judgment should be rendered; so that, unless the parties to a primary election contest agree that the votes in contested precincts when counted would result in giving a majority of legal votes to one of the parties, no judgment will be rendered in the Supreme Court that either party was entitled to the nomination.

Appeal from Woodruff Circuit Court, Southern District; *E. D. Robertson*, Judge; reversed.

*Roy D. Campbell*, for appellant.

*Ross Mathis, W. J. Dungan, J. F. Summers* and *J. F. Summers, Jr.*, for appellee.

WOOD, J. W. R. Cain, hereafter called appellant, instituted an action in the Woodruff Circuit Court against E. M. CarlLee, hereafter called appellee, contesting the result of the Democratic primary election held in August, 1924, by which the appellee was declared the nominee for county judge. The pleadings and the proceedings had at the first trial are set forth in the opinion of this court in *Cain* v. *CarlLee*, 168 Ark. 64. This is the second appeal in the case. The judgment of the trial court was reversed on the first appeal and the cause remanded for a new trial because of an error of the court in holding that certain names which had been added to the assessment list of poll taxpayers of Woodruff County, contrary to the requirements of § 3738, C. & M. Digest, were qualified electors. After remand of the cause the appellant filed an amendment to his original complaint in which he set out a list of voters consisting of 145 in the Augusta precinct, 9 in Revell box, Augusta precinct, 79 in Cotton Plant precinct, 64 in McClellan precinct, 43 in White River, 33 in Point, 25 in Coney, making a total of 398 names. Appellant alleged that these names had been added by the collector to the legal assessment list of poll taxpayers contrary to the provisions of § 3738, C. & M. Digest; that not less than 328 of these illegal votes were cast for the appellee. He prayed that these illegal votes be deducted from the legal votes received by the appellee, which would give the contestant a plurality of the legal votes cast; and appellant prayed that he be declared the

nominee, and that the appellee be ousted from office, and for all proper relief.

The appellee moved to dismiss the cause. He alleged that the appellant had violated §§ 3902, 3904, and 3899 of the law designated in chapter 54 of Crawford & Moses' Digest as the "corrupt practice act," and that under § 3775 appellant could not maintain the contest, and that he should be proceeded against as provided in § 3774 as for violation of the corrupt practice act. The appellant responded to the motion to dismiss and denied the allegations thereof, and among other things alleged that the allegations of the motion constituted no defense to the election contest instituted by the appellant. The court, after hearing the evidence adduced on the motion, took the same under advisement, to which ruling the appellant and the appellee both excepted.

On the issues thus joined the cause came on for a hearing on the 22d of May, 1925, and during the progress of the trial, on May 27th, the appellee moved to exclude from consideration as evidence in the cause the ballot boxes and ballots of the precincts of Pumpkin Bend, Tip and Chapple Grove, alleging that certain ballots in these boxes were changed from the way they were cast. The appellant moved the court to exclude from the evidence the ballot box and ballots therein of Augusta, alleging that the judges and clerks permitted Mrs. John Harrelson to vote ballot No. 440 for E. M. CarlLee, when Mrs. John Harrelson did not appear at the polls and cast a ballot. The appellant also moved the court to strike from consideration of the testimony the ballot box of the precinct of Cotton Plant, alleging that the judges and clerks counted therein ballot No. 307 cast by Mrs. Roy B. Parnell, when Mrs. Roy B. Parnell did not in fact cast a ballot in said box and did not appear at the precinct of Cotton Plant to vote. The court reserved its decision on these motions of the respective parties until final determination of the cause, to which ruling both parties excepted. When the cause was taken up for final hear-

ing on the merits after the appellant had introduced three witnesses, the bill of exceptions shows that the following occurred: "The court would like to ask counsel what the necessity is for going over the same grounds we did in the former trial. We went through a great number of ballots. I see no necessity for going over that again. Let the attorneys get together on the votes." It was thereupon agreed by the attorneys representing both sides that they would secure the assistance of parties they might agree on and make a count of the votes in that manner and thereby be enabled to present the facts in a more concise way to the court; and those votes upon which they might fail to agree they would submit the facts to the court for his finding; and after several days of arduous work and the end not in sight, the court recessed until the 27th. For that reason the testimony of the witnesses Rives, Mitchell and Cain, above named, is not transcribed and because they were called at a later time." After several days of recess and after the investigation agreed upon by counsel in open court had been completed, it was announced in open court as follows: "We have by agreement eliminated the names which we desired to investigate, as to how they voted, and our lists have been checked repeatedly against each other, and we have agreed, beginning with each township, that, out of the recount as made by the committee, the following numbers of ballots were added without the parties having been assessed and certified to the clerk as required by law." Then follows the result ascertained in the various precincts, naming them, and designating the number of ballots after the elimination of the votes found to be illegal under the former ruling of this court. It was reported that of these illegal votes CarlLee had received 209 and Cain 139. After deducting these votes from the total votes of the respective candidates as reported by the committee appointed by the Democratic Central Committee to recount the ballots, it was found that CarlLee had 638 votes and Cain 676. The court thereupon pro-

ceeded to hear the testimony adduced by the respective parties concerning the integrity of the election in the precincts challenged as a whole and also the individual votes in precincts where same were questioned, and at the conclusion thereof announced as follows: "After hearing the evidence and the remarks of counsel and being sufficiently advised in the premises, it is by the court considered, ordered and adjudged that the complaint of the plaintiff be dismissed, and that the defendant recover his costs herein."

The appellant filed a motion for a new trial in due time setting up in the first, second and third assignments of error that the verdict was contrary to the law and the evidence; in the fourth, fifth and sixth, twelfth and thirteenth assignments that the trial court erred in rendering a decision in the case without making any special findings of fact on the evidence or ruling upon the pleadings and motions in the cause. In the seventh and eighth assignments that the court erred in allowing testimony to be introduced on the motion to dismiss the appellant's complaint and amended complaint; in the ninth assignment that the court erred in failing to cast out the entire vote of the Augusta precinct; in the 10th that the court erred in failing to cast out the entire vote in the Cotton Plant precinct; in the 11th that the court erred in permitting the records of the town council of McCrory to be introduced and particularly an instrument in writing purporting to be an agreement of certain members of the town council of McCrory to vote for an appropriation of certain money of the Planters' Mercantile Company for the purpose of paying the poll taxes; in the fourteenth, fifteenth, sixteenth and seventeenth assignments the court erred in passing upon the vote in certain precincts which were designated, including those in the precincts of Pumpkin Bend, Tip and Chapple Grove. In the 18th assignment that the judgment of the court is erroneous because it was contrary to the evidence and because the agreement of counsel shows conclusively that the appellant

received a plurality of the votes cast at the primary election.

The court handed down a written opinion in its order overruling the motion for a new trial, holding that the precincts of Cotton Plant and Augusta should not be disregarded for the reason that the alleged illegal votes in these precincts could be segregated without assailing the integrity of the entire box. But that in each of the precincts of Pumpkin Bend, Tip and Chapple Grove, respectively, there were two votes changed to Cain after they had been cast by the voters by a line drawn through the name of CarlLee or Bronte and the erasure of a line which had been drawn through the name of Cain. The court held that this fraud, having been done by the judges *or some one in charge of the ballots,* impugns the integrity of the box, so the entire vote of these precincts should be thrown out.

The court further found that with these precincts disregarded there was no reason for finding the specific number each candidate received on a final count, it being apparent that the majority was against the contestant. The court disposed of the 4th, 12th and 13th paragraphs of the motion, relating to the failure of the court to make specific findings on the evidence and the rulings on the pleadings before or at the time of the rendition of the judgment, by saying that the contestant filed no request or prayer for special finding or declarations of law, and only made the request orally after the final judgment was pronounced. From the judgment rendered dismissing the appellant's complaint, he duly prosecutes this appeal.

1. We find no error in the rulings of the court in failing to announce its conclusions of fact and law at the time or before it entered its judgment. The statute requires that, in trials of questions of fact by the court, it shall state in writing the conclusions of fact separately from the conclusions of law. Section 1309, C. & M. Digest. But, in the absence of a specific request by the party against whom the judgment is rendered that the court

make a special, instead of a general, finding of its conclusions of fact and law, there is no reversible error in the court's making a general finding of law and facts, and where the party against whom the judgment is rendered in his motion for a new trial assigns as error the failure of the court to make separate and special findings of fact and declarations of law, the court may, if it elects, then treat the motion as one for special findings.

In *Apperson* v. *Stuart*, 27 Ark. 619, we held that the findings upon the facts by the court sitting as a jury required by law to be reduced to writing need not necessarily be put in writing before judgment, but the court may, after the judgment, reduce the same to writing. In that case, speaking of that provision of the law, Chief Justice English said that the object of this provision was "doubtless that a memorial of them might be furnished and preserved," and he adds, "but we can see no particular reason why this cannot be done as well after as before the rendering of the judgment." See also *Nathan* v. *Sloan*, 34 Ark. 524; *Jewell* v. *Williams*, 127 Ark. 58. In the last case we held that, where a cause is tried before a circuit judge, it is the duty of the appellant to request the court to make a written finding of fact and to object to his failure to do so. We also held that "the motion for a new trial was an assignment of the error alleged to have been committed, and was not a request that the findings of the court be then reduced to writing and filed." But, even if it could be said that the motion for a new trial in the case at bar was tantamount to a request for special separate findings of fact and law, still the court's written findings in overruling appellant's motion for a new trial were a sufficient compliance with the law; for these findings fully advised the appellant of the court's rulings and furnished and preserved the memorial which is the design of the law. After the court had made these special findings of law and fact, if appellant desired to object to them, either as to the time of the filing, or that they were not full enough, he should

have drawn the attention of the trial court thereto, and, not having done so, he is certainly in no attitude to complain here. The appellant's assignments of error therefore, as contained in the 4th, 12th and 13th grounds of the motion for a new trial, are not well taken.

2. The final decision of the Democratic Central Committee of Woodruff County gave 847 votes to the appellee and 915 to the appellant. This was the result by including in the count the votes of persons who had not been assessed according to the decision of this court on the former appeal. On remand of the cause and by agreement of the parties, as above stated, the various ballot boxes in Woodruff County were purged of such votes, and it was ascertained that the appellee had received 209 of these illegal votes and the appellant 139. Deducting these from the votes of the respective parties as shown by the central committee, the appellee received 638 votes and the appellant 676, which must be taken as the *prima facie* returns and result of the primary election as between the appellant and the appellee for county judge of Woodruff County.

Proceeding from this point, the trial court investigated the result of the primary election under the testimony adduced by the respective parties, and, as stated in his order overruling the motion for a new trial, found generally in favor of the appellee, the basis of his finding being that the precincts of Cotton Plant and Augusta should not be thrown out, but that the entire precincts of Pumpkin Bend, Tip and Chappel Grove should be thrown out. The court gave as its reason for so holding that in cases where illegal votes can be segregated from the others without assailing the integrity of the box, without casting a doubt as to the legality of the others, only the illegal votes should be thrown out. The court announced the correct principle of law and correctly applied it as to the precincts of Cotton Plant and Augusta. The record shows that the appellant called one Minor Kittrell, who testified that he was one of the judges of the primary

election at the Augusta box in August, 1924. He was asked if he knew John Harrelson and his wife and answered in the affirmative. Thereupon one of the attorneys for the appellee made the following statement: "At the time this election was held, Mrs. Harrelson was living, and had been an invalid for about a year; she died some two or three days afterwards; Mr. Harrelson, the husband, informed me that one of the judges went up to her house, she having expressed a desire to vote, on account of a relative being a candidate, and, to satisfy her, he did; she wrote her name very plainly at that time; we consider that that is not a legal vote, and we ask permission now to withdraw that ballot, when we obtain the box." Thereupon the attorney for the appellant stated: "I just want to show how some things went on—that's all." But counsel for appellant did not interrogate witness Kittrell any further, nor offer to do so, and must, therefore, be held to have accepted the statement of counsel for the appellee as the truth, as it doubtless was, concerning the vote of Mrs. Harrelson. It was admitted that the vote of Mrs. Harrelson was for CarlLee.

Concerning the precinct of Cotton Plant, the appellant called Mrs. R. B. Parnell, who testified that she had lived at Cotton Plant for six years. She was not at the primary election of August, 1924; was at her home on that day; did not attend the election and did not vote. She was asked the following question: "Your name appears on the list of voters in Cotton Plant box as number 311. Do you know how your name got to be in that box?" She answered, "I do not have any idea." She was further asked: "Did you sign a ballot or have anything to do with the election on that day?" She answered, "No sir." On cross-examination, she stated that she didn't know of any other Parnells in Cotton Plant. Her name was Lena Francis, and on redirect examination she stated that her husband's initials were R. B. The list of voters at the Cotton Plant precinct registered by the clerks of the election showed that there were 310 votes.

Number 307 was the vote of Mrs. R. B. Parnell, and that ballot was cast and counted for CarlLee. At the Augusta box there were 411 registered votes.

The above is the only testimony in the entire record offered to impeach the integrity of the precincts of Augusta and Cotton Plant. The testimony is wholly insufficient for that purpose, and the trial court ruled correctly in so holding. In *Crawford* v. *Harmon,* 149 Ark. 343, under a precisely similar state of facts as that which occurred at the Augusta box, we said: "It does not appear that this was done with any fraudulent design, but with an honest purpose on the part of the judges to permit the sick man to cast his ballot. The court properly threw out this ballot as having been illegally cast, but it afforded no ground for discarding the whole vote of the precinct." The same may be said also as to the Cotton Plant precinct. The testimony of Mrs. Parnell is not sufficient to show any fraud upon the part of the officers conducting the election in that precinct. Fraud cannot be predicated upon the single and isolated circumstance revealed by the testimony of Mrs. Parnell that she didn't attend the election at that precinct, whereas a vote is registered in her name as No. 307. This was a large precinct, having more than 300 registered voters.

The realm of speculation offers too many contingencies that would account for an honest mistake in this one ballot registered in the name of Mrs. Parnell to make her testimony the basis for a charge and proof of fraud upon the part of the judges and clerks of election at that precinct such as would impeach the entire returns of that box. The ballot corresponding to this number was not produced. If such occurrences had been numerous, or if there had been any other badges of fraud, this, in connection with other *indicia* tending to prove fraud, might have made a different case, but the testimony in this record is wholly insufficient to justify overturning the finding of the trial court as to these precincts.

But it occurs to us that the same doctrine which the court announced and applied in passing upon the pre- cincts of Augusta and Cotton Plant should have also been followed in the precincts of Pumpkin Bend, Tip and Chapple Grove. As to these latter boxes the court found the facts to be as follows: "These, by an inspection of the ballots and the evidence of the men who cast them, the fact is established that two votes in each of these pre- cincts were changed to Cain after they were cast by the voters, by a line drawn through the name of CarlLee or Bronte, and an erasure of the line which had been drawn through the name of Cain." The court announced the law with reference to these to be that: "where fraud- ulent votes are found in a box and cannot be accounted for and segregated so as to avoid impugning the integrity of the box * * * this character of fraud, having been found by the judges or some one in charge of the ballot, impugns the integrity of the box so that the entire vote of these three precincts should be thrown out." The conclusion of law thus announced by the trial court is sound, and should be applied to the very facts which the court found concerning the precincts of Pumpkin Bend, Tip and Chapple Grove. The court, in reaching its final deter- mination in the cause, should have taken into considera- tion the votes in these precincts instead of excluding them from the count. The court should have counted the votes shown to have been changed for the candidate in whose favor the ballots were actually cast, and, in the absence of proof showing that other ballots were simi- larly changed, the court was not justified in impugning the integrity of all the remaining ballots, but should have counted them, as they were returned by the election officers, in favor of the candidate for whom they appeared on their face to have been cast. In other words, the tes- timony in this record is not legally sufficient, as we view it, to justify the court in concluding that the judges and clerks of the election in the precincts of Pumpkin Bend, Tip and Chapple Grove were guilty of fraud in conduct-

ing the election, which fraud should result in the impeachment of the entire vote of those precincts. It will be observed that the court found, upon inspection of the ballots, that two of the votes in each of these precincts had been changed from the candidate for whom they really voted to Cain; that this was done by drawing a line through the name of Cain's opponents and erasing a line drawn through the name of Cain. The above testimony was sufficient to warrant the court in segregating these ballots and counting them for the candidate in whose favor they were cast according to the testimony of the voters who actually cast the ballots. But we cannot concur in the view of the learned circuit judge that "this is a character of fraud that impugns the integrity of the entire precinct." Now, all of the ballots in these precincts were under the inspection of the trial judge, and he only found two in each precinct that bore any evidence of alteration, and these were shown by the parties casting the ballots to have been changed. But to declare that the remaining ballots in these precincts were likewise altered and changed is a declaration without any proof whatever to sustain it. The integrity of entire precincts must not be destroyed upon bare suspicion and without any proof to show actual fraud in the conduct of the officers of the election. No testimony has been abstracted tending to prove that the judges and clerks of election, or either of them, made these changes. There is nothing to show when, or by whom, such alterations were made, nor whether they were made before or after the returns were lodged in the keeping of the county central committee.

The object of our Constitution and laws concerning elections is to guarantee that the sovereign will of the electorate as expressed by their ballots is not thwarted. It is to this end that the Constitution provides that "if the officers of any election shall unlawfully refuse or fail to receive, count or return the vote or ballot of any qualified elector, such vote or ballot shall nevertheless be counted upon the trial of any contest arising out of said

election." Article 3, § 11, Constitution. All the duties prescribed for primary election officers and the safeguards thrown around primary elections as provided in our primary election laws contained in chap. 54, C. & M. Digest, are enacted for the same purpose. The presumption is that election officers have done their duty and obeyed the provision of the Constitution and statutes in holding an election. Hence, the returns made by them showing the result of an election are *prima facie* correct, and are not to be overturned except by proof to the contrary. Thus it is that in all election contests the returns of the election officers in the various precincts challenged will not be set aside as a whole except upon proof tending to show a course of conduct upon the part of the election officers, or some of them, indicating that they were guilty of such fraud in conducting the election as to make it impossible to fairly ascertain who received the majority of the votes cast. To justify the wholesale disregard of the returns of election precincts, the testimony must be such as to prove fraud on the part of the election officers themselves in conducting the election. But, unless such fraud is shown upon the part of the election officers, the returns should only be purged of illegal ballots, and the remainder counted as shown by these returns. The above principles of law have often been announced by this court. *Govan v. Jackson,* 32 Ark. 553; *Thompson v. Hinckle,* 35 Ark. 456; *Dickson v. Orr,* 49 Ark. 238, 241; *Freeman v. Lazarus,* 61 Ark. 247; *Saylor v. Rankin,* 125 Ark. 557; *Crawford v. Harmon,* 149 Ark. 348, are some of our numerous cases.

Learned counsel for the appellee contend, however, that, regardless of any question of fraud upon the part of the election officers, the court was correct in casting out the entire returns from the precinct of Pumpkin Bend for the reason that the judges and clerks of election did not take the oath as prescribed by § 3755, C. & M. Digest, and that the returns of the election were not certified as required by § 3766 of C. & M. Digest. The

oath required is set forth in the record and is signed by the judges of Pumpkin Bend precinct. The oath of the clerks of that precinct is only signed by one of the clerks, and the certificate required is set forth, but not signed by the judges. To sustain their contention, counsel rely upon the case of *Thompson* v. *Hinckle*, 35 Ark. 450. But an examination of that case will discover that it has no application whatever to election contests. There is no provision in the primary election law requiring the county central committee, to whom the returns are made, to refuse to receive the returns unless the statutes in regard to the oath and certificate above mentioned are complied with. There is nothing in the statute requiring the court, when a contest is instituted, to ignore those precincts where the above provisions of the statute have not been complied with.

Section 3768 of the Digest requires the county central committee to canvass the returns, and, when demanded, to examine the ballots, hear testimony, if offered, of fraudulent practices and illegal votes, and to cast out illegal votes or fraudulent returns and find the true and legal vote cast for each candidate. This statute shows clearly that it was never contemplated that irregularities in the election such as a failure of the judges and clerks to comply with the statute in regard to the oath and certificate, should vitiate the result of the election. Moreover, under the provisions of art. 3, § 11, of the Constitution above, notwithstanding any refusal or failure of the election officers to return the vote or ballot of any qualified elector, such vote or ballot must nevertheless be counted upon any contest arising out of such election. Under our Constitution and statute, the trial court hearing the election contest must ascertain who received a majority of the legal votes cast at the election, whether they were returned by the election officers or not. See *Govan* v. *Jackson*, and *Dickson* v. *Orr*, *supra*.

3. It is further urged by counsel for the appellee that the appellant violated the Corrupt Practices Act, and

that therefore appellee's motion to dismiss appellant's cause of action should have been sustained on that ground, and that the judgment of the trial court should now be affirmed here for that reason. The procedure for contesting the results of primary elections is prescribed by statute. Section 3772 of the Digest provides in part, "A right of action is hereby conferred *on a candidate to contest the certification of nomination or the certification of vote as made by the county central committee.* * * * The complaint shall be supported by the affidavit of at least ten reputable citizens and shall be filed within ten days of the certification complained of, if the complaint is against the certification in one county, and within twenty days if against the certification in more than one county. The complaint shall be answered within ten days."

Section 3773 prescribes the method of procedure after the complaint is filed. Section 3774 provides for criminal procedure to be instituted against those who may have violated the Corrupt Practices Act.

Section 3775 provides in substance that, should it be proved to the satisfaction of the trial judge in a case instituted under any of the above sections "that a successful candidate has been guilty of violating any provision of the Corrupt Practices Act or any other violation of the law regulating primary elections, the circuit court shall enter such finding as a part of the judgment, irrespective of the determination of the issues in the suit instituted under §§ 3772, 3773, or the verdict of the jury in a criminal prosecution; and the judgment to that effect shall operate to deprive the candidate of the nomination and right to have his name on the ballot, and the vacancy shall be filled by a special primary or otherwise, as may be determined by the party organization."

It will be noted that "a right of action is conferred upon any *candidate* to contest the certification of nomination or the certification of vote as made by the county central committee," and there is no proviso or condi-

tion precedent attached thereto to the effect that such candidate in order to prosecute and maintain his action must not himself have been guilty of violating the Corrupt Practices Act.

Section 3776 of the Digest provides in substance that a defendant in contest of election proceedings under the primary election law, or one who has been prosecuted for a violation of the Corrupt Practices Act and who shall have been elected to office as the nominee of the party, after it is determined that he was not entitled to the nomination, or judgment entered contains a finding that he violated the Corrupt Practices Act, shall be ousted from office, and the vacancy shall be filled as provided by law for filling vacancies in such office in case of death or resignation. In *Ferguson* v. *Montgomery,* 148 Ark. 83, at page 101, this court, in construing this section, said: "The object was to prevent one illegally nominated, and thereby securing an election at the general election, from holding the office during the term provided by law or a material portion thereof, and thereby rendering abortive the contest proceeding." Even though appellant should finally succeed in this action in having a judgment of ouster entered against the appellee, nevertheless appellant could not be a direct beneficiary of such judgment.

We are convinced, therefore, that § 3772 expressly confers upon the appellant the right to maintain this action, and certainly there is no inhibition upon that right contained in the Corrupt Practices Act as construed in *Ferguson* v. *Montgomery, supra.* To construe the Corrupt Practices Act, as contended by the appellee, as inhibiting a candidate who had violated the Corrupt Practices Act from maintaining an action contesting the result of the election and nomination of the successful candidate for the same office at the primary election would be nothing more nor less than judicial legislation. If the law be defective in this particular, it is not the province of this court to correct it. A trial by the court

upon the merits of the cause was tantamount to overruling appellee's motion to dismiss, and the court did not err in such ruling.

4. It is conceded in the brief of counsel for the appellee that Cain received 23 votes in the precinct of Tip, and CarlLee 3; in Chapple Grove precinct Cain received thirteen votes and CarlLee two, and in Pumpkin Bend precinct Cain received forty-nine votes and CarlLee one, making a total of 85 votes for Cain and six votes for CarlLee in the three precincts that were cast out by the trial court. "With these precincts disregarded," declares the trial court, "there was no reason for finding the specific number each candidate received on a final count, it being apparent that the majority was against the contestant." The court does not indicate by this finding that it would have found the majority in favor of the contestant if the votes of the entire precincts of Tip, Chapple Grove and Pumpkin Bend had not been cast out. So we take it there has been no final count and result of the primary election declared by the trial court including the returns from all the precincts in that county.

Counsel for appellant concludes his original brief by saying that if "this court does not feel justified in rendering a judgment for the appellant here so that this case may not again have to be remanded, we then ask this court to affirm this case." But it is not the province of this court to try the facts unless they are undisputed. It then becomes a question of law as to what judgment should be rendered, and this court may then render such judgment as should have been rendered by the trial court. Therefore, unless the parties should agree here that the votes in the precincts of Tip, Chappel Grove and Pumpkin Bend, when counted in favor of Cain, would result in giving him a majority of the legal votes in the primary election, we cannot render a judgment here in appellant's favor and a judgment of ouster against the appellee. Therefore, for the error indicated, the judgment is reversed and the cause is remanded for a new trial.